# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HEDGEYE RISK MANAGEMENT, LLC, | |
| *Plaintiff*, | |
| v. | Civil Action No. 16-935 (RDM) |
| PAUL HELDMAN; HELDMAN SIMPSON PARTNERS, | |
| *Defendants*. | |

## <u>MEMORANDUM OPINION</u>

This case arises out of an alleged breach of a non-compete covenant between a financial analyst and his former employer. In 2008, Paul Heldman, a health policy analyst who provides research to institutional investors, joined a small policy research firm based in the District of Columbia called Potomac Research Group ("PRG"). His employment contract with PRG included two restrictive covenants that prohibited him from engaging in certain activities for one year after his departure from PRG: a non-compete covenant that prohibited Heldman from providing his services to a similar firm and a non-solicitation covenant that barred him from inducing PRG's customers and employees to leave PRG. In 2015, a larger financial and economic research firm, Hedgeye Risk Management, purchased PRG's assets. Hedgeye contends that, in purchasing PRG's assets, it acquired Heldman's contract, and it alleges that he breached the non-compete and non-solicitation covenants in that contract when, in early 2016, he left Hedgeye to found a competing investment advisory firm. Hedgeye also alleges that Heldman breached his fiduciary duty to Hedgeye during the five weeks that he was a Hedgeye employee by soliciting its customers and employees to follow him to his new firm.

The matter is before the Court on Hedgeye's motion for a preliminary injunction and for partial summary judgment, both limited to the breach of contract claim. Dkt. 3. The defendants have filed a motion to dismiss or, in the alternative, for summary judgment, with respect to the entire complaint. Dkt. 11. The Court held a hearing on the preliminary injunction motion and argument on the additional motions. For the following reasons, the Court will deny Hedgeye's motion and will grant the defendants' motion. Specifically, the Court will grant summary judgment to the defendants on the contract claim and will dismiss the remaining claims without prejudice.

## I. BACKGROUND

### A. Heldman and PRG

Paul Heldman is a "health policy analyst" who specializes in "research that forecasts legislative and regulatory outcomes for institutional investors." Dkt. 11-1 at 22 (Defs.' Mot. Summ. J. ("MSJ"), Decl., ¶ 1) ("Heldman Decl."). He has worked as a policy analyst for 16 years. *Id.* In 2008, Heldman joined a small research firm in Washington, D.C., called Potomac Research Group. *Id.* (Heldman Decl. ¶ 2). Although the parties have not produced an executed copy of the document, Heldman appears to have signed a contract with PRG in November 2008 that governed his employment there.[1] *See* Dkt. 1-1 (Compl., Ex. 1) ("PRG Contract"). Under the employment contract, Heldman was entitled to a base salary of $300,000 and incentive compensation to be determined annually, *id.* at 2, although Heldman alleges he did not receive any incentive payment in 2012 or 2013, Dkt. 18 at 1 (Supp. Heldman Decl. ¶ 4).

---

[1] Heldman suggests in a footnote in his initial opposition brief that "the actual existence and validity of the 2008 PRG Contract are in substantial doubt given the fact that the copy relied upon by Hedgeye in its Verified Complaint and the present motion is unsigned." Dkt. 10 at 2 n.1. But Heldman does not appear genuinely to contest that the 2008 contract at some point governed his employment with PRG. *See* Dkt. 17 at 7–8, 12–13.

Of greater relevance here, the 2008 contract also contained two covenants prohibiting

Heldman from competing with PRG in the event of his departure.  The first stated:

<u>**Non-Compete:**</u>     (1)  Employee agrees that, for a period of one year after the last day that Employee is employed by PRG, Employee will not, directly or indirectly, without the written prior consent of PRG, work for or provide services to another company that engages in the business of delivering health policy-focused research information (nor deliver such services directly) to institutional investors in different formats, including, without limitation, research reports, telephone calls, meetings and conferences.

Dkt. 1-1 at 2 (PRG Contract).  The covenant went onto provide that Heldman could "enter into a

commercial activity that competes with PRG" if he left "for Good Reason," which the covenant

defined (1) as "a termination of Employee by Employer (other than for Cause)" or (2) as "a

voluntary termination by Employee" following a number of circumstances not relevant here.  *Id.*

at 3.  The second covenant stated:

<u>**Non-Solicitation:**</u>     Employee agrees that, for a period of one year after the last day that Employee is employed by PRG, Employee will not, directly or indirectly, without the written prior consent of PRG, solicit or induce any person or entity who at the time is or who was at any time during the Employee's employment an employee, subscriber, customer, consultant, contractor, vendor, or supplier of PRG or any of its affiliates, to cease, curtail, or refrain from entering into any such relationship with PRG or any of its affiliates or any of their respective publications.

*Id.*

## B.    Hedgeye and PRG

Hedgeye Risk Management, LLC, is an investment advisory firm based in Connecticut

that "provides financial and economic research and analysis to institutional investors" as well as

"newsletter products to mass market customers."  Dkt. 3-3 at 2 (Pl.'s Mot. for Prelim. Inj., Ex. 1,

¶ 2) ("Blum Aff.").  On December 15, 2015, Hedgeye entered into an asset purchase agreement

("APA") with PRG.  *See generally* Dkt. 1-2 (Compl., Ex. 2) ("APA").  Although PRG continued to exist as an independent entity following the transaction, Hedgeye acquired PRG's assets in the business.  *See id.*  Both Michael Blum, Hedgeye's president, and Suzanne Clark, PRG's founder and CEO, represent that "Hedgeye's acquisition of PRG's intellectual talent . . . was crucial to PRG's asset sale."  Dkt. 3-5 at 2 (Pl.'s Mot. for Prelim. Inj., Ex. 3, ¶ 7) ("Clark Aff."); *see also* Dkt. 3-3 at 2 (Blum Aff. ¶ 4).  Clark further states that Hedgeye's "acquisition" of Heldman's services, in particular, was "crucial" to the asset sale.  Dkt. 3-5 at 2 (Clark Aff. ¶ 7).

The APA is a detailed 65-page document.  *See* Dkt. 1-2 (APA).  It provides that PRG "shall sell, convey, transfer and assign to [Hedgeye], . . . all of [PRG]'s right, title, interest in and to the assets relating to the [b]usiness."  *Id.* at 2 (APA at 1).  It further states that "[s]aid assets are described on Exhibit A," and "shall include but not be limited to" thirteen categories of assets, many (but not all) enumerated on separate schedules.  *Id.* at 2–3 (APA at 1–2).  Those categories include PRG's inventory, equipment, accounts receivable, contracts, intellectual property, and permits (each enumerated on a separate schedule attached to the APA), as well as PRG's "proprietary information," "office and other supplies," advance payments and deposits, records and accounting data, "all general, financial and personnel records," telephone numbers and Internet addresses, and "all other rights and assets relating to, or used in connection with[,] the conduct of" PRG.  *Id.*  The APA also includes a "representations and warranties" section.  *Id.* at 9 (APA at 8).  As relevant here, that section contains a warranty that "Schedule 5.13 contains (a) a list of all employees of [PRG] as of the date hereof (together with each employee's job title); (b) each such employee's length of service, and (c) the current annual compensation of each such employee."  *Id.* at 11 (APA at 10).  Heldman is listed as an employee on Schedule

5.13. *Id.* at 60 (APA, sch. 5.13). Neither he nor his employment contract is otherwise referenced in the APA, including in the schedules that enumerate PRG's assets.

Three other provisions of the APA are relevant here. The first, Section 2.1, describes the liabilities and obligations that Hedgeye would assume. It states that Hedgeye would assume "all liabilities and obligations relating to employee benefits, compensation, or other arrangements with respect to employees of [PRG] arising on or after December 1, 2015," and specifically provides that Hedgeye would pay Heldman a $25,000 end-of-year bonus. *Id.* at 4 (APA at 3). The second relevant provision, Article VIII, provides that neither PRG nor its founder, Suzanne Clark, would compete with Hedgeye for a period of three years. *Id.* at 14 (APA at 13). This section, which is entitled "non-competition," does not refer to Heldman. The third relevant provision, Section 9.1(a), states that Hedgeye would "in [its] sole and absolute discretion, offer employment effective on the Closing Date or thereafter, to all employees of [PRG]." *Id.* at 15 (APA at 14).

## C.    **Hedgeye and Heldman**

Heldman was aware of the ongoing negotiations between PRG and Hedgeye but was formally told two days after the execution of the APA that PRG's assets had been sold to Hedgeye. Dkt. 11-1 at 23 (Heldman Decl. ¶ 5). According to Heldman, Hedgeye proceeded to meet with individual PRG employees on the afternoon of December 17, 2015, to discuss the terms and conditions of their employment with Hedgeye. *Id.* Heldman states that he was provided a letter "offering [him] employment that contained non-compete and non-solicitation language." *Id.* (Heldman Decl. ¶ 6); *see id.* at 29 (Defs.' MSJ, Ex. A) ("Employment Letter"). Heldman and Hedgeye negotiated over the terms and conditions of Heldman's employment at Hedgeye for the following five weeks. *Id.* at 23–27 (Heldman Decl. ¶¶ 7–27); *id.* at 33–34

(Defs.' MSJ, Exs. B, C). The focus of these negotiations, according to Heldman, was whether the employment agreement would include a non-compete provision and, if so, the terms of that provision. *Id.* at 24 (Heldman Decl. ¶ 10). Heldman represents that at no time was he ever told, either by Hedgeye representative or by PRG's owner, Suzanne Clark, that he was already subject to an existing non-compete agreement. *Id.* at 23–25 (Heldman Decl. ¶¶ 8, 10, 14). Clark, however, disputed this at the preliminary injunction hearing, testifying that she told Heldman on at least one occasion that he was subject to an existing non-compete agreement.

Although the record is unclear regarding the details of Heldman's departure from Hedgeye, the parties agree that he left the firm on January 21, 2016, and shortly thereafter founded a competing investment advisory firm, Heldman Simpson Partners ("HSP"). Dkt. 3-1 at 5; Dkt. 11-1 at 27 (Heldman Decl. ¶ 27–28). In its complaint, Hedgeye advances two allegations regarding Heldman's conduct around this timeframe. It alleges that, "[u]pon information and belief," Heldman "used [Hedgeye's] instrumentalities to start his business while he was still employed with Hedgeye." Compl. ¶ 23. The complaint also alleges that Heldman "has reached out to and solicited Hedgeye clients in order to provide health policy research information services to them," but it does not allege whether this conduct occurred before or after Heldman's departure from Hedgeye. *Id.* ¶ 24. Heldman denies that he acted disloyally during the five-week period in which he was a Hedgeye employee. He states that he left Hedgeye on January 21, 2016, upon declining a "final offer" of employment that would have reduced his salary, Dkt. 11-1 at 27 (Heldman Decl. ¶ 27); that he and a co-worker, Sasha Simpson, started HSP five days after he left Hedgeye, *id.* at 27–28 (Heldman Decl. ¶ 28); and that "[a]t no time while [he] was working at Hedgeye did [he] encourage any clients to move their business from Hedgeye" or

"encourage [Simpson or another co-worker] to terminate their employment with Hedgeye," *id.* at 28 (Heldman Decl. ¶¶ 30–31).

## D.     The Present Action

Hedgeye filed this action on May 18, 2016.  Dkt. 1.  The complaint asserts six common-law contract and tort claims against Heldman and his new firm, Heldman Simpson Partners, but the parties treat two counts as controlling: Count II, which asserts that Heldman breached the terms of his 2008 contract with PRG (and particularly the non-compete covenant); and Count III, which asserts that Heldman breached his fiduciary duties to Hedgeye when he solicited its clients and employees to leave.  *See* Compl. ¶¶ 28–37.  In addition to filing a complaint, Hedgeye filed a motion for a preliminary injunction, arguing that it is entitled to immediate relief—specifically, the enforcement of the non-compete and non-solicitation covenants in Heldman's 2008 employment agreement with PRG.  Dkt. 3.  It clarified at oral argument that the motion for a preliminary injunction is limited to its breach-of-contract claim.  At an initial hearing on the motion, Hedgeye also agreed that the Court should treat the motion for a preliminary injunction as a motion for partial summary judgment—also limited to the breach of contract claim.  The defendants filed a motion to dismiss or, in the alternative, for summary judgment with respect to the entire complaint.  Dkt. 11.  The motions are now fully briefed.

The Court held a hearing on the motion for a preliminary injunction, and arguments on the remaining motions, on June 30, 2016.  Hedgeye offered testimony from two witnesses: Clark, the founder of PRG, and Todd Jordan, Hedgeye's chief financial officer.  The defendants did not call any witnesses.

## II. LEGAL STANDARD

This case is before the Court on motions governed by three different legal standards: Hedgeye's motion for a preliminary injunction, the cross-motions for summary judgment, and the defendants' motion to dismiss.

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20. Before the Supreme Court's decision in *Winter*, courts in this circuit weighed the preliminary injunction factors on a sliding scale, allowing a weak showing on one factor to be overcome by a strong showing on another. *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360–61 (D.C. Cir. 1999). Since *Winter*, several judges on the D.C. Circuit have questioned, without deciding, whether this rule remains valid. *See Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011); *Davis v. PBGC*, 571 F.3d 1288, 1292 (D.C. Cir. 2009). But even if the sliding-scale approach remains good law, a plaintiff who can show "*no* likelihood of success on the merits" cannot obtain a preliminary injunction. *Ark. Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009) (emphasis added).

This matter is also before the Court on the parties' cross-motions for summary judgment. Summary judgment is granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895–96 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the outcome of the

litigation. *Holcomb*, 433 F.3d at 895; *Liberty Lobby*, 477 U.S. at 248. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ." Fed. R. Civ. P. 56(c)(1)(A).

The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified." *See Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987). When a motion for summary judgment is under consideration, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Pepco*, 447 F.3d 843, 850 (D.C. Cir. 2006). The non-movant's opposition, however, must consist of more than unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-movant must provide evidence that would permit a reasonable jury to find in its favor. *See Laningham v. United States Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). If his evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249–50.

Finally, a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) is designed to "test the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In evaluating such a motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim to relief,' and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible

on its face.'" *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. A plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," but the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56.

## III. DISCUSSION

### A. Contract Claim

Hedgeye's primary claim is that Heldman breached the non-compete and non-solicitation covenants set out in his 2008 employment agreement with PRG by establishing a competing investment firm upon his departure from Hedgeye in January 2016. Compl. ¶¶ 28–32. Hedgeye has moved for a preliminary injunction and for summary judgment on this claim. *See* Dkt. 3-1 at 7–9. The defendants have moved to dismiss this claim, or, in the alternative, for summary judgment. Dkt. 11-1 at 12–17. Although the legal standards applicable to the parties' motions vary, because the Court concludes that the defendants are entitled to summary judgment on this claim, it need not address the parties' other motions regarding the breach of contract claim.

Hedgeye's breach of contract claim involves an ordinary question of contract interpretation. Under District of Columbia law, "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties regardless of the intent of the parties at the time they entered into the contract, unless the . . . language is not susceptible of a clear and definite meaning." *See Aziken v. District of Columbia*, 70 A.3d 213, 218–19 (D.C. 2013)

(quoting *Hartford Fin. Servs. Group v. Hand*, 30 A.3d 180, 187 n.12 (D.C. 2011)). Only "[w]here the contract language is not susceptible of a clear and definite meaning—*i.e.*, where the contract 'is determined by the court to be ambiguous'"—shall the court consider evidence of the parties' intent. *Id.* at 219 (quoting *Rivers & Bryan, Inc. v. HBE Corp.*, 628 A.2d 631, 635 (D.C. 1993)). "Whether a contract is ambiguous is a legal question" for the court, not a factfinder, to decide.[2] *Id.*

Here, the principal question before the Court is whether Heldman's employment contract was one of the assets that the APA conveyed from PRG to Hedgeye. Hedgeye argues that the parties' intent was to convey the employment contract to Hedgeye—indeed, that its primary goal in purchasing PRG was to acquire the services of its employees. Because the APA conveyed the 2008 employment contract, Hedgeye argues, it may enforce the contract's non-compete covenant, and Heldman is in violation of the covenant. Dkt. 3-1 at 7–9; Dkt. 19 at 10–15. The defendants, in turn, argue that the APA did not convey the 2008 employment contract to Hedgeye; that Hedgeye therefore cannot enforce the contract; and that Hedgeye's breach of contract claim accordingly fails. Relatedly, they also argue that 2008 employment contract was

---

[2] In an order on June 16, 2016, the Court directed the parties to address, in their reply briefs, the question of "[w]hich jurisdiction's substantive law should apply in this diversity action." Dkt. 20 at 1. Hedgeye asserts, in response, that District of Columbia law applies because "[t]he parties to this litigation and the underlying employment agreement are all based in Washington D.C.," and that the APA's choice-of-law provision, which provides that the APA "will be governed by and construed and interpreted in accordance with the substantive laws of the State of Delaware," Dkt. 1-2 at 16 (APA at 15), cannot be enforced by the defendants, because they were not party to the APA. Dkt. 22 at 2, 5. Heldman responds that the choice of law is irrelevant, because "there is no conflict between Delaware law and that of the District of Columbia" with respect to any legal question implicated by this case. Dkt. 23 at 12. Because the Court agrees that it can discern no difference between the two legal regimes that would bear on this case, and because Heldman has effectively waived any argument that Delaware law, not District of Columbia law, should apply, the Court will apply District of Columbia law in this action.

not an asset that was subject to transfer, because the relevant covenants protected only PRG, which ceased to conduct business in December 2015.[3]  The Court agrees with the defendants that the 2008 employment agreement was not among the assets that the APA transferred from PRG to Hedgeye.

The Court observes at the outset that the question whether an employer may unilaterally assign an employment contract containing a non-compete clause to the employer's successor in interest is a difficult one that implicates important public-policy considerations.  *See* 6 Richard A. Lord, *Williston on Contracts* § 13:13 (4th ed. 2009); Adam Schneid, Note, *Assignability of Covenants Not to Compete: When Can a Successor Firm Enforce a Noncompete Agreement?*, 27 Cardozo L. Rev. 1485 (2006).  Several state courts of highest resort have concluded that, because covenants not to compete are "personal in nature," they are unassignable "absent the employee's express consent."  *Traffic Control Servs., Inc. v. United Rentals Nw., Inc.*, 87 P.3d 1054, 1058 (Nev. 2004); *see also, e.g.*, *Hess v. Gebhard & Co.*, 808 A.2d 912, 921 (Pa. 2002).  There are good reasons for such a rule.  For one, as a general matter, covenants not to compete "should be construed narrowly" because they "impose a restraint on an employee's right to earn a livelihood."  *Hess*, 808 A.2d at 921; *see also* Restatement (Second) of Contracts § 188 cmt.g (1981 & 2016 Supp.).  And even if a covenant not to compete is, in itself, enforceable against an employee, the fact that the employee "may have confidence in the character and personality of one employer does not mean that [he] would be willing to suffer a restraint on his employment

---

[3]  The defendants also argue that: (1) the 2008 employment agreement was not assignable, because it referred only to PRG and did not use a generic term like "employer," *see* Dkt. 17 at 7–8; and (2) in any event, the 2008 agreement was no longer in effect in 2015, because PRG had breached it by failing to pay Heldman a bonus in 2012 and 2013, Dkt. 17 at 8; Dkt. 23 at 9–11. Because the Court concludes that the 2008 employment agreement was not in fact transferred to Hedgeye in the APA, it need not reach these alternative arguments.

for the benefit of a stranger to the original undertaking." *Hess*, 808 A.2d at 922. These policy concerns are heightened, moreover, where (as here) the transfer is achieved through a sale of assets, rather than through a merger. *See* Schneid, *supra*, at 1486 & n.6.

As far as the Court can discern, the District of Columbia Court of Appeals has not resolved this question: the parties cite no controlling authority from the District of Columbia courts, and the Court has found none. Hedgeye relies on a case from this Court, *Evening News Ass'n v. Peterson*, 477 F. Supp. 77 (D.D.C. 1979), for the proposition that employment contracts may be assigned without the consent of the employee. But *Peterson* does not explicitly discuss contemporary District of Columbia law, and even if it did, it has no bearing on the question whether an employment contract *with a covenant not to compete* can be assigned without the employee's consent. In the end, however, the Court has no need to decide whether D.C. law would permit an employer to assign or convey such a contract, because the Court concludes that PRG did not assign or convey Heldman's employment contract to Hedgeye in the APA—and that the APA is unambiguous in this respect. The Court reaches this conclusion for several reasons.

First, the APA enumerates the assets that PRG conveyed to Hedgeye, and it does not list or otherwise identify the 2008 employment agreement between PRG and Heldman. Article I of the APA lists thirteen categories of assets conveyed to Hedgeye, six of which are specifically enumerated on "schedules" attached to the APA. Dkt. 1-2 at 2–3, 27–66 (APA at 1–2, schs.). Section 1.1(d) of the APA states that those "contracts, leases, purchase orders, sales orders, contracts to purchase material, contacts to receive services or supplies, contracts to sell products and materials and all other binding agreements of [PRG] (collectively, the '*Assumed Contracts*') including the contracts set forth on Schedule 1.1(d)" conveyed to Hedgeye. *Id.* at 3 (APA at 2)

(emphasis added). Schedule 1.1(d) corresponds to Section 1.1(d); where Section 1.1(d) refers to "all . . . binding agreements of" PRG as the "Assumed Contracts," Schedule 1.1(d) is titled "Assumed Contracts." Schedule 1.1(d), in turn, simply provides that "[a]ll contracts set forth on Schedule 5.7 and Schedule 5.15 are incorporated by reference herein." *Id.* at 33 (APA sch. 1.1(d)) (emphasis added). Schedules 5.7 and 5.15 list dozens of contracts. But the 2008 employment contract between Heldman and PRG is not among the listed—or "Assumed"— contracts; indeed, none of the "Assumed Contracts" are employment contracts. *Id.* at 52–55, 61– 65 (APA schs. 5.7, 5.15).

Hedgeye insists that Heldman's employment contract was nonetheless an asset conveyed to it by the APA. Dkt. 3-1 at 7–9; Dkt. 19 at 10–15. It argues that "PRG agreed to transfer and assign to Hedgeye *all* of the assets of its business, including its employee contracts," and it suggests that the fact that the employees' names and salaries are set out in the "DISCLOSURE SCHEDULE TO THE ASSET PURCHASE AGREEMENT" (the schedules attached to the APA) buttresses its understanding that the employee contracts were conveyed in the APA. Dkt. 3-1 at 8; *see* Dkt. 1-2 at 60 (APA sch. 5.13); *see also id.* at 3 (APA at 2) (conveying "all other rights and assets relating to, or used in connection with[,] the conduct of the Business"). The Court does not doubt that Hedgeye purchased "all" of PRG's "assets" as an ongoing business, but that does not answer the critical question whether Heldman's employment contract was, in the view of the parties to the APA as reflected in that contract, an "asset" of the business. The text and structure of the APA answer that question, and they belie any claim that PRG's employment contracts were among the "assets" conveyed in the APA.

As explained above, Article I of the APA describes the "assets" that PRG intended to convey to Hedgeye. *See* Dkt. 1-2 at 2 (APA at 1). Those "assets" are set out in schedules that

begin with "Schedule 1.1"—corresponding to Section 1.1 of the APA ("Sale of Assets"). *See id.* at 2–3, 28–39 (APA at 1–2, sch. 1.1). Nothing in Article I or the corresponding schedules, however, includes any reference to employment contracts—or, indeed, to any PRG employees. Article V of the APA, in contrast, does refer to PRG employees. Unlike Article I, however, Article V does not transfer assets; instead, it sets out the "representations and warranties" that PRG made to Hedgeye. *See id.* at 9 (APA at 8). Section 5.13 contains PRG's "warranty" that "Schedule 5.13 contains . . . a list of all employees of [PRG]" and their salaries. *Id.* at 11 (APA at 10). And Schedule 5.13—the only schedule in the APA to refer to Heldman—in fact contains just such a list. *Id.* at 60 (APA sch. 5.13). The fact that Heldman's name and salary appears in the APA, in other words, hardly suggests that Heldman (or his employment contract) was an "asset" that the APA conveyed to Hedgeye. To the contrary, the fact that they appear on Schedule 5.13 (which corresponds to the "representations and warranties" made by PRG), instead of Schedule 1.1 (which corresponds to the transfer of assets), supports the conclusion that they were not.

The remainder of the contract further rebuts any claim that the APA conveyed employment contracts (including Heldman's) to Hedgeye as "assets" of PRG. Most importantly, Article IX expressly addresses "Employees and Employee Benefits," yet it says nothing about conveying any existing employment contracts to Hedgeye. Dkt. 1-2 at 15 (APA at 14). What Article IX does say, moreover, supports precisely the opposite conclusion. In particular, Section 9.1(a) states that Hedgeye "shall, in [its] sole and absolute discretion, offer employment . . . to all employees of [PRG]." *Id.* The same section further contemplates that some employees will be "offered such employment and [will] accept said employment," *id.*, whereas others will not. The fact that the APA explicitly provides that Hedgeye could *offer* employment to PRG employees,

and that those employees might then either accept or reject such an "offer," is squarely at odds with Hedgeye's contention that PRG's existing employment contracts conveyed to Hedgeye as "assets" of PRG.

Finally, Article VIII of the APA expressly addresses "non-competition," but it too says nothing about Heldman. The "non-competition" clause, instead, is limited to PRG and its founder, Clark. *See id.* at 14 (APA at 13). The absence of any discussion in this provision of whether other PRG employees—including Heldman—would be allowed to compete with Hedgeye thus casts further doubt on the argument that the APA effectively barred Heldman and others from competing with Hedgeye. And, when considered along with the other provisions discussed above, it makes clear that Hedgeye is simply wrong when it contends that it "acquired PRG's talented employees" when it signed the APA. Dkt. 3-1 at 2.

Hedgeye's remaining textual arguments are equally unpersuasive. Hedgeye argues that the provision of the APA that conveyed PRG "liabilities and obligations" to Hedgeye also conferred Heldman's contract. *Id.* at 8. According to Hedgeye, Section 2.1 transferred "*all* liabilities and obligations *relating to employee benefits*, compensation or other arrangements with respect to employees of [PRG] arising on or after December 1, 2015," and specifically required Hedgeye to pay Heldman a "$25,000 end of year bonus" by March 31, 2016. *See* Dkt. 1-2 at 4 (APA at 3) (emphasis added). But the fact that the parties stipulated to the assumption of certain employee-related liabilities—specifically, those liabilities that arose between December 1, 2015, and the time that the purchase was complete, and certain year-end payments to certain employees, including Heldman—is hardly evidence that they meant the employment contracts to transfer wholesale to Hedgeye. Indeed, if anything, the fact that the parties agreed on exactly which *pre-existing* liabilities Hedgeye would incur (in connection with the provision

of the APA that required Hedgeye to renegotiate employment contracts with PRG employees) suggests that the parties did not intend the contracts to convey *prospectively*.

Hedgeye's only remaining argument—and, in truth, its primary argument—is that "the entire point of the sale between PR[G] and Hedgeye was that Hedgeye was desirous of obtaining PRG's talent." Dkt. 3-1 at 8. That is, Hedgeye argues that its goal in acquiring PRG (and thus in executing the APA) was to acquire the services of PRG's employees, and particularly Heldman. *See id.* (arguing that the APA provision requiring Hedgeye to pay Heldman's bonus "evidenc[es] Heldman's clear value to the transaction"). It is not hard for the Court to believe that Hedgeye desired to hire PRG's employees, nor that it wanted to hire Heldman in particular. But it is hard to read the APA to achieve that result itself—not in light of the APA's express statement that Hedgeye may "*offer* employment" to all PRG employees. *See* Dkt. 1-2 at 15 (APA at 14) (emphasis added).

To be sure, Clark did testify that she told Heldman that he would remain subject to the non-compete covenant in his 2008 employment agreement even after the effective date of the APA. That testimony is at odds with Heldman's declaration, however, and there is no evidence that Hedgeye ever asserted such a right during the five-week period in which it attempted to reach an agreement with Heldman. *See, e.g.*, Dkt. 11-1 at 23–27 (Heldman Decl. ¶¶ 6–27); *id.* at 29–32 (Employment Letter); *id.* at 33–34 (Defs.' MSJ, Exs. B, C). To the contrary, during that period, Heldman and several Hedgeye employees engaged in extensive negotiations regarding the terms and conditions of his employment there. As the e-mails attached to Heldman's motion for summary judgment make clear, the focus of those negotiations was instead whether he would accept a non-compete covenant. *See id.* at 24 (Heldman Decl. ¶ 10) ("It would have made no sense to have engaged in these discussions and negotiations . . . if I was already under a non-

compete agreement with Hedgeye.").  But, regardless of what Clark may have said, or how Heldman and Hedgeye may have acted, parol evidence of the parties' intent is relevant only "[w]here the contract language is not susceptible of a clear and definite meaning—*i.e.*, where the contract 'is determined by the court to be ambiguous.'"  *Aziken*, 70 A.3d at 219 (quoting *Rivers & Bryan*, 628 A.2d at 635).  Here, the Court concludes that the language of the APA is clear, and that it does not assign Heldman's employment contract to Hedgeye.

Finally, the fact that the APA envisioned that Hedgeye would negotiate new terms of employment—including, if appropriate, new non-compete clauses—is also consistent with the language of Heldman's 2008 employment contract with PRG.  The employment contract was between Heldman and PRG, and, although no longer an operating company, PRG did not merge with Hedgeye and, indeed, continues to exist as an entity separate from Hedgeye.  More importantly, the non-compete clause included an exception upon "termination of Employee *by Employer* (other than for Cause)."  Dkt. 1-1 at 3 (PRG Contract at 2) (emphasis added).  Here, as Heldman notes, his status as an employee of PRG came to an end on the effective date of the APA, and that change in status occurred for reasons "other than for Cause."  Similarly, the non-solicitation clause merely precluded Heldman from "solict[ing] or induc[ing] any person or entity . . . to cease, curtail or refrain from entering into" a customer or employment "relationship *with PRG* or any of *its affiliates*."  *Id.* (emphasis added).  Here, neither Hedgeye nor PRG contends that Heldman solicited or induced anyone to stop doing business, or from leaving employment, with *PRG*.  Whether or not this is the only plausible construction of the 2008 employment agreement, it is—at a minimum—consistent with the understanding embodied in the APA that Hedgeye would need to negotiate its own employment agreements with the PRG employees it sought to retain.

Because the APA did not convey Heldman's employment contract to Hedgeye, Hedgeye is not entitled to enforce its non-compete and non-solicitation covenants.  Accordingly, the Court will grant summary judgment to the defendants on Hedgeye's contract claim, and will deny Hedgeye's motion for a preliminary injunction and motion for summary judgment with respect to that claim.

## B.     Breach of Fiduciary Duty Claim

Hedgeye also argues that Heldman breached his fiduciary duty to Hedgeye by "actively soliciting [its] clients and employees."  Compl. ¶ 36.  Hedgeye originally appeared to move for a preliminary injunction based on both its breach of contract and breach of fiduciary duty claims. *See* Dkt. 3 at 9–10.  At oral argument, though, Hedgeye's counsel conceded that Hedgeye was not entitled to injunctive relief on the latter claim.  As a result, all that is pending before the Court with respect to Hedgeye's breach of fiduciary duty claim is the defendants' motion to dismiss or, in the alternative, for summary judgment.  *See* Dkt. 11-1 at 17.  The Court will grant the defendants' motion to dismiss this claim, but will grant Hedgeye leave to file an amended complaint, if appropriate.

Under the common law of agency, "[e]mployees . . . 'owe an undivided and unselfish loyalty to the corporation' during the term of their employment, 'such that there shall be no conflict between duty and self-interest.'"  *Phillips v. Mabus*, 894 F. Supp. 2d 71, 92 (D.D.C. 2012) (quoting *Mercer Mgmt. Consulting v. Wilde*, 920 F. Supp. 219, 233 (D.D.C. 1996)).  As a result, "[a]lthough an agent may 'make arrangements or plans to go into competition with his principal before terminating his agency,' he may only do so 'provided no unfair acts are committed or injury done [to] his principal.'"  *Id.* (quoting *Mercer Mgmt.*, 920 F. Supp. at 233).  "The ultimate determination of whether an employee has breached his fiduciary duties to his

employer by preparing to engage in a competing enterprise must be grounded upon a thoroughgoing examination of the facts of the particular case." *Furash & Co., Inc. v. McClave*, 130 F. Supp. 2d 48, 54 (D.D.C. 2001) (quoting *Maryland Metals, Inc. v. Metzner*, 382 A.2d 564, 569–70 (Md. 1978)). But, as a matter of D.C. law, "*after* termination of his employment [and] in the absence of an agreement to the contrary," an agent "may compete with his former principal." *United States Travel Agency, Inc. v. World-Wide Travel Serv. Corp.*, 235 A.2d 788, 789 (D.C. 1967) (emphasis added).

Here, Hedgeye contends that Heldman "solicit[ed] Hedgeye clients and employees to leave Hedgeye and join, or send business to, Heldman Simpson," and that in doing so he "used confidential and proprietary Hedgeye information to Hedgeye's detriment." Dkt. 3-1 at 10. The problem is that Hedgeye's complaint contains no more than the thinnest of allegations regarding an alleged breach of fiduciary duty. The complaint avers, "[u]pon information and belief," that Heldman "used [Hedgeye's] instrumentalities to start his business while he was still employed with Hedgeye." Compl. ¶ 23. But the bare allegation that Heldman used its "instrumentalities," even taken as true, falls far short of the level of detail required to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Hedgeye's complaint also alleges that, "upon information and belief," Heldman "has reached out to and solicited Hedgeye clients in order to provide health policy research information services to them." Compl. ¶ 24. But absent an allegation that this conduct occurred *while Heldman was employed at Hedgeye*, this allegation, too, falls short of making out a claim for breach of fiduciary duty.

Accordingly, the Court will grant the defendants' motion to dismiss Hedgeye's breach of fiduciary duty claim. But because Hedgeye may be able to plead facts sufficient to withstand a

motion to dismiss—even if it has not yet done so—the Court will dismiss the claim without prejudice. *See Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (per curiam) ("A dismissal *with prejudice* is warranted only when a trial court 'determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" (quoting *Jarrell v. U.S. Postal Serv.*, 753 F.2d 1088, 1091 (D.C. Cir. 1985))). For instance, if Hedgeye has a good-faith basis for alleging that Heldman "reached out to and solicited Hedgeye clients" *while he was employed with Hedgeye*, such an allegation would likely be sufficient to withstand a motion to dismiss. For present purposes, however, the Court finds that Hedgeye's complaint does not "state a claim to relief that is plausible on its face," *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570), and so will grant the defendants' motion to dismiss Count III without prejudice.

## C.    Remaining Claims

Finally, in its opposition brief to the defendants' motion to dismiss or, in the alternative, for summary judgment, Hedgeye clarified that Count I, which seeks injunctive relief, is solely "a recitation of Hedgeye's requested injunctive relief," and not a freestanding cause of action. *See* Dkt. 19 at 9. And at oral argument, Hedgeye's counsel clarified that Counts IV, V, and VI are derivative of its other claims, and that those claims could not stand alone if the Court found that Counts II and III failed. Because the Court is granting summary judgment to the defendants on Count II and dismissing Count III without prejudice, it will dismiss the remaining claims as well, and permit Hedgeye to re-plead them in an amended complaint to the extent there is a good-faith basis to do so.

**CONCLUSION**

For these reasons, the Court will deny Hedgeye's motion for a preliminary injunction and motion for partial summary judgment, Dkt. 3, and will grant the defendants' motion to dismiss or in the alternative for summary judgment, Dkt. 11. A separate Order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: July 8, 2016