# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HEDGEYE RISK MANAGEMENT, LLC,

*Plaintiff*,

v.

PAUL HELDMAN,

*Defendant*.

Civil Action No. 16-935 (RDM)

## MEMORANDUM OPINION AND ORDER

This is the third round of dispositive motions practice in a contentious dispute between an investment research firm, Hedgeye Risk Management, LLC ("Hedgeye"), and one of its former employees, Paul Heldman. After Hedgeye purchased the assets of Heldman's former employer, Potomac Research Group ("PRG"), Hedgeye and Heldman were unable to come to terms on an employment agreement. Heldman and Hedgeye thus parted ways, and Heldman started his own firm, along with two colleagues who also left Hedgeye. In round one, the Court denied Hedgeye's motion for a preliminary injunction, granted summary judgment in Heldman's favor on Hedgeye's claim for breach of contract, and dismissed without prejudice Hedgeye's breach of fiduciary duty claim on the ground that the complaint did not allege that Heldman engaged in any wrongful conduct while employed by Hedgeye. Dkt. 26. In round two, Hedgeye filed an amended complaint renewing and supplementing its claims for breach of fiduciary duty, interference with advantageous business relations, and constructive trust. Dkt. 28. Once again, Heldman (and his company, Heldman Simpson Partners) moved to dismiss or, in the alternative for summary judgment. Dkt. 29. Hedgeye, in turn, opposed that motion, Dkt. 33, and moved for leave to file a second amended complaint, Dkt. 37. The Court denied Hedgeye's motion for

leave to amend as futile, denied Heldman's motion to dismiss Hedgeye's claim for breach of fiduciary duty, granted Heldman's motion to dismiss Hedgeye's tortious interference claim as conceded, granted Heldman's motion to dismiss Hedgeye's constructive trust claim, and denied Heldman's motion for summary judgment on the fiduciary duty claim on the ground that Hedgeye was entitled to take discovery on that claim before responding to Heldman's motion. Dkt. 41.

Round three now presents the question that the Court postponed deciding in round two pending completion of discovery—that is, is Heldman entitled to summary judgment on Hedgeye's claim for breach of fiduciary duty? Dkt. 90. In that sole remaining claim, Hedgeye alleges that Heldman "breached his fiduciary obligation to [Hedgeye] by actively soliciting [Hedgeye's] clients and employees while [he was] employed [by] Hedgeye, by using and appropriating confidential and sensitive Hedgeye information, and by using Hedgeye instrumentalities to do so." Dkt. 50 at 4–5 (2d Am. Compl. ¶ 29). In Heldman's view, these allegations are not supported by a scintilla of evidence. He, accordingly, not only seeks summary judgment, Dkt. 90, but also moves for sanctions pursuant to Federal Rule of Civil Procedure 11, Dkt. 115.

As explained below, the Court agrees with Heldman that there is no evidence that he solicited Hedgeye clients while employed by Hedgeye. There is some evidence—albeit slim— however, that would permit a reasonable jury (1) to find that Heldman solicited two Hedgeye employees—Sasha Simpson and Raca Banerjee—to leave Hedgeye and to join him in a competing business while he was still employed by Hedgeye, and (2) to find that at least some of the business cards that Heldman took with him when he left Hedgeye were Hedgeye's property. This is not by any measure an overwhelming case for Hedgeye. But it is enough to avoid

summary judgment and the award of sanctions to Heldman. The Court, accordingly, will grant

Heldman's motion for summary judgment in part and will deny it in part and will deny his

motion for sanctions.

## I. BACKGROUND

The Court has previously described the relevant background, *see Hedgeye Risk Mgmt.,*

*LLC v. Heldman*, 196 F. Supp. 3d 40, 42–45 (D.D.C. 2016) ("*Hedgeye I*"); *Hedgeye Risk Mgmt.,*

*LLC v. Heldman*, 271 F. Supp. 3d 181, 185–86 (D.D.C. 2017) ("*Hedgeye II*"), and will repeat

that background only as relevant here.

Hedgeye "provides financial and economic research and analysis to institutional investors

and newsletter products to mass market customers." Dkt. 50 at 2 (2d Am. Compl. ¶ 6). In

December 2015, Hedgeye purchased the assets of PRG, Heldman's former employer. *Id.* (2d

Am. Compl. ¶ 9). Heldman worked for Hedgeye for approximately five weeks following the

sale, during which time the parties engaged in negotiations regarding the terms of Heldman's

continued employment. Dkt. 90-3 at 1 (Def.'s SUMF ¶ 3); Dkt. 124 at 2–3 (Pl.'s SUMF

¶¶ 7,19). At the time, Heldman managed a team that oversaw the firm's health policy research.

*Id.* at 1 (Pl.'s SUMF ¶ 4). That team allegedly generated over 70% of the PRG's annual revenue.

*Id.* at 1 (Pl.'s SUMF ¶ 3); Dkt. 127 at 34 (Heldman Dep. 34:3–10). On January 4, 2016,

Hedgeye hired Raca Banerjee who, along with Sasha Simpson, completed Heldman's three-

person health policy research team. Dkt. 129 at 10–11 (Banerjee Dep. 10:2–5, 11:2–14).

Around the same time, Heldman, Simpson, and Banerjee were all negotiating with Hedgeye over

their employment contracts. Among other things, Heldman was concerned about a proposed

contractual term that would have limited his ability to compete against Hedgeye if he left the

firm, and, when Simpson and Banerjee asked him "whether they should sign" similar covenants

in their contracts, he told them that it was "up to" them but that he "would not sign it" and, indeed, was "not signing" his. Dkt. 127 at 267–68 (Heldman Dep. 267:16–268:13). Heldman further testified that he told Banerjee "to hold off" signing an employment contract with Hedgeye. *Id*. at 102–03 (Heldman Dep. 102:5–103:22)

On Hedgeye's view of the facts, soon after it purchased PRG, Heldman began planning his departure. *See* Dkt. 125 at 5. Hedgeye further contends that, around late December and continuing through January, Heldman began collecting data from Hedgeye's files that would be useful in his new venture. *Id.* at 5–7. It asserts, in particular, that Heldman sought and was given (by a Hedgeye employee) certain "scorecards" that indicated how much Hedgeye clients valued the work of individual analysts, *id.* at 5; began reviewing employee salary data, *id.* at 7; accessed a marketing presentation, *id.*; and engaged in an "increased pattern" of using Hedgeye's Salesforce database, which contained information regarding the firm's clients, *id.* at 18. Hedgeye also contends that Heldman began engaging in "closed-door meetings" with Simpson and Banerjee. *Id.* at 6. Heldman, in response, asserts that, to the extent those meetings happened, they were work-related, *see* Dkt. 127 at 268–69 (Heldman Dep. 268:20–269:25), although he does not deny having "at least half a dozen" conversations outside of work with Simpson about the possibility of forming a new company, *see id.* at 93–94, 96–97 (Heldman Dep. 93:14–94:25, 96:22–97:17), including the specific possibility of Simpson and him forming a venture together, *id.* at 100–01 (Heldman Dep. 100:22–101:8); *see also* Dkt. 128 at 163–64 (Simpson Dep. 163:20–164:7).

On January 21, 2016, Heldman departed Hedgeye under circumstances that are in dispute; he claims he was terminated, Dkt. 127 at 109–110 (Heldman Dep. 109:19–110:12), while the firm asserts that he resigned, Dkt. 125 at 5. It is undisputed, however, that within

about an hour of Heldman's departure, Simpson and Banerjee resigned from the firm. *See* Dkt. 127 at 112 (Heldman Dep. 112:10–19). Simpson and Banerjee each claim that they chose to resign independent of Heldman's departure and independent of one another. *See* Dkt. 128 at 168 (Simpson Dep. 168:1–20); Dkt. 129 at 87–91 (Banerjee Dep. 87:20–90:13, 91:2–11). There is no dispute, however, that their resignations happened so close in time that Simpson and Banerjee departed Hedgeye on the same elevator, *see* Dkt. 128 at 180–81 (Simpson Dep. 180:14–181:4), and that Heldman, who was fired or quit about an hour earlier, was still outside the building, *see* Dkt. 127 at 112 (Heldman Dep. 112:12–19). In addition, all three—Heldman, Simpson, and Banerjee—acknowledge that, after their departures, they met in the firm's parking lot and, together, all three rode in Heldman's car to Simpson's apartment. *Id.* at 112–15 (Heldman Dep. 112:7–115:19); Dkt. 128 at 186–89 (Simpson Dep. 186:15–189:19).[1]

It is also undisputed that Heldman and Simpson announced the founding of their own firm, Heldman Simpson Partners ("HSP"), the day after their departure from Hedgeye, Dkt. 127 at 144 (Heldman Dep. 144:5–10); that Banerjee was hired as one of HSP's employees, *see id.* at 146 (Heldman Dep. 146:16–20); Dkt. 129 at 102 (Banerjee Dep. 102:3–12); that HSP used business cards that Heldman had acquired over the years, including during his tenure at PRG/Hedgeye, to create HSP's initial client contact list, *see* Dkt. 127 at 204 (Heldman Dep. 204:3–16); and that HSP began operating (and competing with Hedgeye) within days of its formation, *see id.* at 371 (Heldman Dep. 371:18–25). In short, there is no dispute that, days after

---

[1] On Heldman's account, it was mere coincidence that all three met in the parking lot an hour after his departure—he claims that he only happened to be there because "[i]t was an emotional goodbye" after having spent seven years at PRG, which had been acquired by Hedgeye. *See* Dkt. 127 at 113 (Heldman Dep. 113:2-12).

their departure from Hedgeye, Heldman's health policy research team began operating a new firm that "directly competes with Hedgeye." Dkt. 50 at 3 (2d Am. Compl. ¶ 21).

In light of these events, Hedgeye contends that Heldman breached his fiduciary obligations to the firm in three respects: First, Hedgeye alleges that, *prior* to his departure, Heldman recruited Simpson and Banerjee to join him in founding and operating the new business, thereby causing a "mass resignation" of Hedgeye's health policy research team. Dkt. 125 at 1. Second, it contends that Heldman solicited Hedgeye's clients before leaving the firm. Dkt. 50 at 4–5 (Second Am. Compl. ¶ 29). Third, it alleges that Heldman used and appropriated "confidential and sensitive Hedgeye information" to compete with the firm. *Id*. As explained below, there is no evidence to support the contention that Heldman solicited Hedgeye clients during his time at that firm. There are genuine disputes of material fact, however, with respect to at least portions of Hedgeye's remaining contentions. The Court, accordingly, will grant in part and deny in part Heldman's motion for summary judgment, Dkt. 90, and will also deny Heldman's motion for sanctions, Dkt. 115, which is, in the main, duplicative of his motion for summary judgment.

## II. LEGAL STANDARD

This matter is before the Court on Defendant's motion for summary judgment. Dkt. 90. A court should grant summary judgment if, and only if, "the movant shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the outcome of the litigation. *Liberty Lobby*, 477 U.S. at 248. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ." Fed. R. Civ. P. 56(c)(1)(A).

A party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified." *See Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987). "When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in its favor." *Sloan v. Urban Title Servs.*, 770 F. Supp. 2d 227, 233 (D.D.C. 2011) (citing *Liberty Lobby*, 477 U.S. at 255). The non-movant's opposition, however, must consist of more than mere denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c). That is, the non-movant must provide evidence that would permit a reasonable jury to find in its favor. *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). If the non-movant's evidence is "merely colorable" and "not significantly probative," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249–50 (internal citations omitted).

The matter is also before the Court on Heldman's motion for Rule 11 sanctions. Dkt. 115. Federal Rule of Civil Procedure 11 "imposes a duty on the signer of a pleading, motion, or paper to conduct a pre-filing inquiry of the relevant facts and law." *Brannock Assocs. v. Capitol 801 Corp.*, 807 F. Supp. 127, 135 (D.D.C. 1992). Under Rule 11, a court may impose sanctions if "a pleading, written motion, or other paper" is (1) "presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation," Fed. R. Civ.

P 11(b), (2) "the claims, defenses, and other legal contentions [therein] are [un]warranted by existing law," *id.*, (3) "the factual contentions have [no] evidentiary support or . . . will likely [not] have evidentiary support after a reasonable opportunity for further investigation or discovery," *id.*, or if (4) "the denials of factual contentions are [un]warranted on the evidence," *id.*

In deciding whether to impose Rule 11 sanctions, courts apply "an objective standard of reasonable inquiry on represented parties who sign papers or pleadings." *Naegele v. Albers*, 355 F. Supp. 2d 129, 143–44 (D.D.C. 2005) (quoting *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 554 (1991)). The "imposition of Rule 11 sanctions is not something the court takes lightly," rather the court considers it "an extreme punishment for filing pleadings that frustrate judicial proceedings." *Id.* at 144.

## III. ANALYSIS

### A.  Hedgeye's Fiduciary Duty Claim

Over the course of the litigation, Plaintiff's claims for relief have been narrowed to a single remaining claim: that Heldman breached the fiduciary obligations he owed Hedgeye during the brief period that passed between Hedgeye's acquisition of PRG's assets to Heldman's departure from Hedgeye. To plead a claim for breach of fiduciary duty under D.C. law,[2] a plaintiff must allege facts sufficient to show that (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that duty; and (3) the breach proximately caused an

---

[2]  Because Heldman worked at Hedgeye's office in Washington, D.C., and allegedly breached his fiduciary duty to Hedgeye in the course of that employment, the Court concludes that D.C. law applies. *See, e.g.*, *Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 714 (D.C. 2013).

injury. *See Dorsey v. Am. Express Co.*, 680 F. Supp. 2d 250, 254 (D.D.C. 2010). Here, all agree that Heldman owed Hedgeye a fiduciary duty during the five weeks that he worked for the firm. The parties disagree, however, about whether Heldman breached that duty and, if he did, whether that breached caused Hedgeye any injury.

In support of their contention that Heldman breached his duty, Hedgeye offers three arguments. First, it asserts that Heldman actively solicited Hedgeye's clients while he was still employed by Hedgeye. Dkt. 125 at 11. Second, it claims that Heldman recruited Simpson and Banerjee to join a competing company that he planned to form and that, as a result of his efforts while still employed by Hedgeye, Hedgeye's entire health policy research team left Hedgeye en masse. *Id.* at 1. Third, it contends that Heldman "used Hedgeye's proprietary information to compete with Hedgeye." *Id.* Heldman, in turn, disputes each of these contentions and maintains that, after having had ample opportunity to take discovery, Hedgeye has failed to identify any evidence that would permit a reasonable jury to find that he violated his fiduciary duty to Hedgeye. *See* Dkt. 90-1 at 2.

The guiding principle for present purposes is that employees, as agents of their employers, "'owe [their employers] an undivided and unselfish loyalty.'" *Phillips v. Mabus*, 894 F. Supp. 2d 71, 92 (D.D.C. 2012) (quoting *Mercer Mgmt. Consulting, Inc. v. Wilde*, 920 F. Supp. 219, 233 (D.D.C. 1996)). That duty requires employees to avoid conflicts between their own self-interest and the employer's interest "during the term of their employment." *Id.* In evaluating that duty, the Court must also consider the "off-setting policy . . . of safeguarding society's interest in fostering free and vigorous competition in the economics sphere." *PM Servs. Co. v. Odoi Assocs.*, No. 03-1810, 2006 WL 20382, at *28 (D.D.C. Jan. 4, 2006) (internal citations and quotations omitted). This means that, in the "absence of an agreement to

the contrary," the common law of agency allows an employee to "compete with his *former* principal." *Phillips*, 894 F. Supp. 2d at 93 (quoting *U.S. Travel Agency Inc. v. World-Wide Travel Serv. Corp.*, 235 A.2d 788, 789 (D.C. 1967). Courts, moreover, have recognized that, even prior to his or her termination, an employee has a privilege to "'make arrangements or plans to go into competition with his principal before terminating his agency.'" *Mercer*, 920 F. Supp. at 233 (quoting *Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (Del. 1980)).

An employee's privilege to prepare to engage in a competing enterprise, however, is not absolute. *See Riggs Inv. Mgmt. Corp. v. Columbia Partners, L.L.C.*, 966 F. Supp. 1250, 1265 (D.D.C. 1997) ("[T]he privilege to compete is limited."). Rather, "[i]n preparing to compete, an employee may not commit wrongful acts, 'such as misuse of confidential information, solicitation of the firm's customers, or solicitation leading to a mass resignation of the firm's employees.'" *Furash & Co. v. McClave*, 130 F. Supp. 2d 48, 53 (D.D.C. 2001) (quoting *Mercer*, 920 F. Supp. at 234); *see also Sci. Accessories Corp.*, 425 A.2d at 965 (noting that "[e]xamples of misconduct which will defeat the privilege" include "misuse of confidential information;" "solicitation of employer's customers prior to cessation of employment;" and "conspiracy to bring about mass resignation of employer's key employees" (internal citations omitted)). Because courts must balance the enforcement of an employee's duty of loyalty with the public interest in promoting competition, the "ultimate determination of whether an employee has breached his fiduciary duties to his employer by preparing to engage in a competing enterprise must be grounded upon a thoroughgoing examination of the facts of the particular case." *Phillips*, 894 F. Supp. 2d at 93 (quotation and citation omitted).

In applying this fact-intensive framework at the summary judgment stage of the

proceeding, it is not the Court's role "to weigh the evidence and [to] determine the truth of the matter" but, rather, "to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. "In making that determination," moreover, the Court "must view the evidence 'in the light most favorable to'" Hedgeye, as the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (citation omitted), and must, for the same reason, draw all reasonable inferences in Hedgeye's favor, *id.* at 660. Even under that favorable standard, some of Hedgeye's contentions do not survive summary judgment. But at least two do.

    1.    *Solicitation of Clients*

It is clear that an employee of a company may not solicit that company's customers while still employed by the company—to do so would constitute a classic violation of the employee's fiduciary duty to his employer. *See*, *e.g.*, *Furash*, 130 F. Supp. 2d at 53. Although Hedgeye contends that Heldman did just that, it has failed to identify *any* evidence that Heldman solicited a single Hedgeye customer before leaving the firm. Had that occurred, Hedgeye would likely have learned about Heldman's disloyalty from a customer or former customer. The Court, however, granted Hedgeye leave to take a limited number of depositions of former customers to determine whether Heldman approached any of them before leaving Hedgeye, *see* Dkt. 56 at 14 (Oct. 31, 2017 Hrg. Tr.), and those depositions revealed no such disloyalty. Heldman, moreover, has attested under the penalty of perjury that "[a]t no time while [he] worked at Hedgeye did [he] suggest or request that a client move its business away from Hedgeye." Dkt. 30-1 at 3 (Heldman Decl. ¶ 12).

In the absence of any direct evidence, Hedgeye attempts to establish a genuine dispute of material fact based on evidence that Heldman engaged in "an increased pattern of accessing client information in Hedgeye's Salesforce database immediately before he left." Dkt. 125 at 18.

That effort fails as well. To start, it is far from clear that Hedgeye has identified evidence of a shift in Heldman's activity. The declaration it cites, for example, merely indicates that Heldman conducted "dozens" of searches in the Salesforce database from December 2015 to January 13, 2016, but it neither provides any comparative information nor identifies any specific client information he allegedly accessed. *See* Dkt. 33-3 at 3 (Kunkel Decl. ¶ 11). But, even assuming that a shift in Heldman's "pattern of accessing client information" did occur, that evidence—without more—does not give rise to a genuine dispute of material fact with respect to Heldman's purported solicitation of Hedgeye's customers. It is one thing to access information and something entirely different to reach out to Hedgeye's customers to suggest that they move their business. It is unsurprising, moreover, that Heldman would frequently access the client database at a time in which he was trying to prove his worth to the company so that he could negotiate a favorable contract.

The absence of any evidence supporting Hedgeye's customer-solicitation claim is perhaps best captured by Hedgeye's own acknowledgement that "[t]he evidence is *more limited* on Heldman's solicitation of clients prior to departing Hedgeye." Dkt. 125 at 20 (emphasis added). Although an understatement, Hedgeye has it right: although, as discussed below, there is a modicum of evidence to support some of Hedgeye's other claims, there is less than a modicum of evidence supporting the company's customer-solicitation claim. Because the evidence is entirely one-sided, no reasonable jury could find that Heldman breached his fiduciary duty by soliciting Hedgeye's customers while still employed by the firm.

The Court will, accordingly grant summary judgment in favor of Heldman with respect to this claim.

2.    *Misappropriation of Proprietary Information*

Hedgeye's second basis for claiming that Heldman breached his fiduciary duty—that he misused Hedgeye's "proprietary information"— stands on slightly firmer ground.  Dkt. 125 at 1. In support of this claim, Hedgeye identifies four types of purportedly confidential information it contends that Heldman misappropriated: (i) "voter scorecards," (ii) "salary data," (iii) "client contact information," and (iv) Heldman's collection of business cards, some of which he acquired during his time with PRG/Hedgeye.  *Id.* at 17.  As explained below, there is no evidence that Heldman misused any of the first three types of information, but there is a factual dispute as to whether some or all of Heldman's business cards were the equivalent of confidential customer lists that Hedgeye acquired when it purchased PRG.  Because Heldman used these cards to compete with Hedgeye, the ownership and status of those business cards constitutes a material fact that precludes summary judgment in this limited respect.

Under the common law of agency, a terminated employee has "a [continuing] duty to the principal not to use or to disclose to third persons . . . trade secrets, written lists of names, or other similar confidential matters given to him only for the principal's use."  *See* Restatement (Second) of Agency § 396(b) (1958).[3]  Although employees may not unfairly exploit their

---

[3]  In their respective motions, both parties cite to the Restatement (Second) of Agency § 396 as controlling authority.  *See* Dkt. 90-1 at 21; Dkt. 125 at 16.  This appears to be consistent with the approach taken by courts in the District of Columbia, which generally follow the Restatement absent contrary authority.  *See, e.g.*, *District of Columbia v. Tulin*, 994 A.2d 788, 797 n.10 (D.C. 2010) (noting that when the Court of Appeals for the District of Columbia is "not bound by [precedent] … or by legislative enactment," it generally construes its decisions to be consistent with the Restatement).  The District of Columbia has previously adopted the Restatement (Second) of Agency § 396 in analyzing an employee's fiduciary duties to his employer.  *See, e.g.*, *Ruesch v. Ruesch Int'l Monetary Sers., Inc.*, 479 A.2d 295, 297 n.3 (D.C. 1984).  It is unclear, however, whether the District of Columbia has adopted the more recent iteration of the Restatement—i.e., the Third Restatement.  *Compare Quincy Park Condo. Unit Owners' Ass'n v. Dist. of Columbia Bd. of Zoning Adjustment*, 4 A.3d 1283, 1290 n.24 (D.C. 2010) (citing the

former employer's confidential information, not all information obtained through the course of employment is protected.  As the Restatement explains, because "an agent frequently acquires information concerning the methods of his employer . . . and becomes acquainted with his employer's customers and their desires," using "[i]nformation of this sort is barred . . . *only to the extent . . . it would be unfair to* [*the agent's*] *former employer*."  *Id.* cmt. b (emphasis added).  Applying this principle here, there is no evidence that Heldman misused the scorecards or salary information to unfairly disadvantage Hedgeye.

As both Heldman and Hedgeye explain, a "vote scorecard" reflects a customer's perception of the value of the work product of individual researchers.  *See* Dkt. 125 at 5–6; Dkt. 127 at 253 (Heldman Dep. 253:14–19).  Heldman acknowledges that he requested and obtained scorecards about his health policy research team from Hedgeye's salespersons beginning in late December.  *See Id.* at 251 (Heldman Dep. 251:5–19).  He explains, though—without contradiction—that he sought the information to use as leverage in negotiating his employment contract with Hedgeye.  *Id.* at 210–11 (Heldman Dep. 210:21–211:14).  Heldman did not hide this fact from his employer, but, rather, notified his supervisor, Daryl Jones, that he was collecting information to show that his team "brought in up to 70[%]" of the firm's revenue.  *Id.* at 211 (Heldman Dep. 211:5–9).  Heldman, in fact, attempted to meet with principals at Hedgeye

---

Third Restatement), *with Hernandez v. Banks*, 65 A.3d 59, 68 (D.C. 2013) (citing the Second Restatement).  The difference is of little moment here, as the principles set out in the Third Restatement largely mirror the principles set out in the Second Restatement.  *Compare* Restatement (Third) of Agency § 8.04 (noting an agent's duty to refrain from competition during the agency relationship); *id.* § 8.05 (noting an agent's duty "not to use or communicate confidential information of the principal for the agent's own purposes"), *with* Restatement (Second) of Agency § 396 (same).  Given the parties' assumption that the Second Restatement governs, the absence of any clear authority to the contrary, and the similarities between the restatements, the Court will apply the principles as articulated by the Second Restatement.

to present a spreadsheet he generated using the scorecard information to prove his value to the company. *Id.* at 87–88 (Heldman Dep. 87:24–88:7).

Hedgeye might have preferred that Heldman not have this information. But the uncontroverted facts show that Heldman collected the information to use only with respect to the internal matter of his employment contract, not to reap some unfair competitive advantage. Indeed, despite ample opportunity for discovery, Hedgeye has produced no evidence to the contrary. To be sure, Hedgeye does suggest that Heldman used the scorecards to glean the contact information of key decisionmakers at client firms. *See* Dkt. 125 at 6. But there is no evidence that Heldman had plans to leave Hedgeye at the time he acquired the scorecards. Rather, the evidence shows that he acquired them in an effort to negotiate a favorable contract with Hedgeye, and the "possibility that a jury might speculate" that Heldman planned all along to use the scorecards to solicit Hedgeye's customers after leaving the firm is "insufficient to defeat summary judgment." *Martin v. Omni Hotels Mgmt. Corp.*, 206 F. Supp. 3d 115, 124 (D.D.C. 2016) (internal quotation and citation omitted). Had Hedgeye offered evidence that Heldman contacted any of the individuals listed on the scorecards, whose names did not also appear on the business cards Heldman used to contact potential clients, or had it shown that Heldman or anyone from HSP referred to the scorecards in soliciting business, Hedgeye's contention might rise above the level of unsupported speculation. But, as the record stands, Hedgeye has failed to identify any evidence that would permit a reasonable jury to find that Heldman breached his fiduciary duty—to Hedgeye's detriment—by reviewing the contents of the scorecards before he left the company.

The second type of information that Hedgeye contends that Heldman misappropriated in breach of his fiduciary duty is information regarding Simpson and Banerjee's salaries. Dkt. 125

at 12. On the record before the Court, however, there is no evidence that Heldman was otherwise unaware of—or could not have easily learned—this information. *See Bancroft-Whitney Co. v. Glen*, 64 Cal. 2d 327, 352 (Cal. 1966) ("It requires little talent to distinguish between a situation in which an individual voluntarily discloses his own salary to another and one in which the unpublished salary list of a group of prospective employees is revealed to a competitor for the purpose of facilitating the recruitment of the corporation's personnel."). Indeed, the record shows that Hedgeye shared Simpson's salary information with Heldman "on the first day that the acquisition was announced," Dkt. 127 at 252 (Heldman Dep. 252:4–8), and that Simpson independently disclosed her salary to Heldman as part of a discussion about her compensation negotiations with Hedgeye, *id.* at 139 (Heldman Dep. 139:12–25). The same cannot be said of Banerjee's salary information, as nothing in the record indicates that Banerjee voluntarily disclosed her salary information to Heldman. Even so, summary judgment is warranted as to this allegation because the record is devoid of any evidence that Heldman used that salary information to lure Banerjee away from Hedgeye or that Heldman could not have simply asked Banerjee what she was paid. *See Sharma v. Wash. Metro. Area Transit Auth.*, 57 F. Supp. 3d 36, 41 (D.D.C. 2014) ("[S]ummary judgment is appropriate where there is no factual basis in the record to support the assertions made by the non-moving party.").

The third and final type of information that Hedgeye claims that Heldman misappropriated is client contact information. Dkt. 125 at 17. The first piece of evidence that Hedgeye has offered in support of this contention is the undisputed testimony that Heldman contacted a then-employee of Hedgeye's, Dan Pastore, to request the email address of a Hedgeye client. *Id.* This fact fails to establish a breach of Heldman's fiduciary duty, however, because the request took place *after* Heldman departed Hedgeye. *See* Dkt. 127 at 258 (Heldman Dep.

258:20–22) (Hedgeye's counsel inquiring whether it was coincidence that Heldman's email to Pastore happened "the day after [Heldman] left Hedgeye."); Dkt. 125 at 17 (arguing that Heldman breached his duty by contacting Pastore "*after* Heldman had left [Hedgeye]"). An "employee's fiduciary duty ends upon termination of the employment relationship," *Phillips*, 894 F. Supp. 2d at 93, and thus Heldman was not in a position of "trust and confidence" when he contacted Pastore.

Next, Hedgeye contends that Heldman misappropriated information contained in the company's Salesforce database. *See* Dkt. 125 at 18. But, Hedgeye has not offered any evidence that would permit a reasonable jury to find that Heldman misappropriated Hedgeye's client information from the Salesforce database. The fact that he accessed the database while still at Hedgeye is not surprising, and Hedgeye has failed to offer any evidence suggesting that Heldman lacked legitimate reason to access it. If evidence that an employee accessed confidential business information relevant to his work prior to departing was—standing alone— sufficient to withstand summary judgment, then it is difficult to imagine the breach of fiduciary duty case that would not make it to the jury. Such an approach is not only at odds with Rule 56, but would also frustrate the public "interest in fostering free and vigorous competition in the economics sphere." *PM Servs. Co*, 2006 WL 20382, at *28.

This, then, leaves Hedgeye's contention that Heldman breached his fiduciary duty by using business cards that he had accumulated over the course of his career to create HSP's initial client list. *See* Dkt. 125 at 18. As to this claim, there is no dispute that Heldman used the business cards to help compile the initial client contact list for HSP, *see* Dkt. 127 at 204 (Heldman Dep. 204:3–16), and there is also no dispute that Heldman obtained at least some of these cards during the time he was employed by PRG, *see id.* at 202 (Heldman Dep. 202:15–20).

Given these facts, Hedgeye contends that the cards constituted Hedgeye's confidential information, just as a customer list would constitute a trade secret. Dkt. 125 at 18. In response, Heldman disputes that the business cards were Hedgeye's property because he acquired them "when he was employed by Washington Research Group, Citigroup and [PRG,] which was prior to his extremely brief 25 workdays at Hedgeye." Dkt. 130 at 7. That contention, however, overlooks a key fact: under the asset purchase agreement, among other things, Hedgeye acquired PRG's "trade secrets," and "customer . . . lists." Dkt. 1-2 at 3 (Asset Purchase Agreement). Although Heldman might nonetheless argue that the business cards were his property all along, that determination involves genuine disputes of material fact for the jury.

There remains the question whether the business cards, even if PRG property that was transferred to Hedgeye, were "trade secrets." In arguing that they were, Hedgeye relies on *Ruesch v. Ruesch Int'l Monetary Servs., Inc.*, 479 A.2d 295 (D.C. 1984).[4] In that case, the D.C. Court of Appeals confronted the question whether a Rolodex card file that an employee kept on her desk, which contained the names of between 800 and 1000 of her employer's clients, was a "trade secret entitled to equitable protection." *Id*. at 295–96. In analyzing that question, the *Ruesch* court relied on six factors identified in the Restatement of Torts:

---

[4] Decisions from outside this jurisdiction are split on this question. *Compare BIEC Int'l, Inc. v. Global Steel Servs., Ltd*., 791 F. Supp. 489, 546 (E.D. Pa. 1992) (observing that the "Third Circuit has expressly held that an employee's personal business contacts, although made while in plaintiff's employ, are not plaintiff's trade secrets"), *with Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1521–22 (Cal. Ct. App. 1997) (holding that information derived from business cards and an employee's memory constituted a "trade secret" because it allowed a competitor to direct sales efforts to customers who had already shown a propensity to use certain products and services). Given that *Ruesch* was decided by the D.C. Court of Appeals and that D.C. law governs this case, the Court will apply the standard set forth in that decision. *See also ILG Indus., Inc. v. Scott*, 273 N.E.2d 393, 396 (Ill. 1971) (adopting the same common law, six-factor test to determine whether certain information constituted a "trade secret").

> (1) [T]he extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the employer] to guard the secrecy of the information; (4) the value of the information to [the employer] and to his competitors; (5) the amount of effort or money expended by [the employer] in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (quoting 4 Restatement of Torts § 757, cmt. b (1939)).

The application of these factors is inherently fact-dependent, and neither Heldman nor Hedgeye has presented the Court with any evidence—much less uncontroverted evidence—that would permit the Court to determine whether the collection of business cards at issue constituted a trade secret. Although business cards themselves are, of course, not generally confidential—and, indeed, their purpose is typically to disseminate information—a collection of business cards might, in some circumstances, capture the same information contained in a confidential customer list. Business cards might also reflect information that is easily found in public sources, such as contact information readily found on the internet, or might reflect information that is confidential and difficult to find, such as information about the identity of key decisionmakers at a firm or those persons' private email addresses. The existing record does not address these questions. Nor does it indicate whether other employees at PRG or Hedgeye had access to the same information; whether anyone took steps to guard the secrecy of the information reflected in the business cards; the value of the business cards to PRG, Hedgeye, or HSP; how Heldman gathered the business cards; how many he gathered; how many he gathered while employed by PRG; whether he gathered them exclusively while doing business for his employer; whether the older cards—gathered before Heldman started work at PRG—were outdated; or whether the business cards contained any confidential notations.

A final additional factor that the *Ruesch* court considered was the industry in question. Specifically, it observed that courts are less likely to protect customer lists when the industry is impersonal and where customer loyalty in the industry, to the extent it exists, is to "the company rather than to a particular employee." *Ruesch*, 479 A.2d at 300. Here, again, the existing record is inconclusive. Although there is some evidence that Heldman's relationships with his clients were personal, and not company-to-company relationships, *see, e.g.*, Dkt. 127 at 97 (Heldman Dep. 97:3–17), the Court cannot conclude that it is factually undisputed that the customers identified in the business cards were loyal only to Heldman and had no independent connection to PRG or Hedgeye.

Construing all of the evidence in the light most favorable to Hedgeye, as it must, the Court concludes that the evidence is either disputed or that there is no evidence at all relating to the status of the business cards. Because Heldman admits to having used the cards in forming HSP, the Court must deny summary judgment as to Hedgeye's claim that Heldman breached his fiduciary duty by misappropriating the business cards and then using them to Hedgeye's competitive disadvantage. Hedgeye's other misappropriation claims, however, fail as a matter of law for the reasons set forth above.

    3.    *Mass Resignation*

Hedgeye's final claim asserts that Heldman violated his duty of loyalty by soliciting Hedgeye's employees to join him in a competing business prior to his departure, thereby causing a "mass resignation" of Hedgeye's health policy team. Dkt. 125 at 12. "The limits of proper conduct with reference to securing the services of fellow employees are not well marked." Restatement (Second) of Agency § 393, cmt. e (1958). On one hand, "it is normally permissible for employees of a firm, or for some of its partners, to agree among themselves, while still

employed, that they will engage in competition with the firm at the end of the period specified in their employment contracts." *Id.* But, on the other hand, "a court may find that it is a breach of duty for a number of the key officers or employees to agree to leave their employment simultaneously and without giving the employer an opportunity to hire and train replacements." *Id.*

Under the so-called "pied piper" rule, a managerial employee may breach his fiduciary duty if, during the course of his employment, he solicits the departure of his subordinates. *See Cent. States Indus. Supply, Inc. v. McCullough*, 279 F. Supp. 2d 1005, 1044 (N.D. Iowa 2003); *see also PM Servs. Co.*, 2006 WL 20382, at *30 (D.D.C. 2006) (citing *Mercer*, 920 F. Supp. at 234) ("Solicitation leading to a 'mass resignation' of the firm's employees will . . . lead to a breach of an employee's fiduciary duty."). "The rule is most clearly applicable if the supervisor-manager, as a corporate pied piper, leads all his employer's employees away, thus destroying the employer's entire business." *Augat, Inc. v. Aegis, Inc.*, 565 N.E.2d 415, 420 (Mass. 1991). "[W]hether or not a departing employee accused of soliciting employees merely presented his colleagues with an opportunity for employment elsewhere, or crossed the line into 'solicitation' in violation of a fiduciary duty, is a fact question that is generally for the jury to decide." *Cent. States Indus. Supply, Inc.*, 297 F. Supp. 2d at 1044. Here, Hedgeye has offered enough— although just barely enough—circumstantial evidence to create a genuine issue of material fact as to whether Heldman acted as a "pied piper" that led his health policy team to resign en masse. *See also Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 497 (Colo. 1989) (providing a helpful summary of the fact-dependent factors courts should consider in deciding "whether an employee's actions amount to impermissible solicitation of co-workers").

Hedgeye contends the following circumstantial evidence would permit a reasonable jury to find that Heldman breached his fiduciary duty by convincing Hedgeye's entire health policy research team to leave Hedgeye at the same time and to join Heldman's competing firm, which he created the next day. First, Heldman and Simpson had numerous "closed-door" meetings in the days before they left Hedgeye, *see* Dkt. 127 at 269 (Heldman Dep. 269:14–20); Dkt. 126 at 31–32 (Blum Dep. 31:22–32:10), and the evidence shows that they had conversations away from the office about the possibility of starting their own business, *see id.* at 93–94, 96–97 (Heldman Dep. 93:14–94:25, 96:22–97:17). Second, the members of Heldman's team all resigned within an hour of each other. *See* Dkt. 127 at 112 (Heldman Dep. 112:10–19). Although Simpson and Banerjee denied that they coordinated their actions, they did quit at the same time and left the building together in the same elevator. *See* Dkt. 128 at 180–81 (Simpson Dep. 180:14–181:4). Third, although the evidence is not consistent, Heldman acknowledges that he advised Simpson and Banerjee not to sign employment agreements with Hedgeye and that he was particularly concerned about the non-compete provision that Hedgeye sought to include. *See* Dkt. 127 at 267–68 (Heldman Dep. 267:18–268:13). Fourth, although Heldman was fired or quit an hour before the others (and although he denies that he was waiting for them) he was still present in the parking lot and met Simpson and Banerjee there immediately after they resigned. *See* Dkt. 127 at 112–15 (Heldman Dep. 112:7–115:19); Dkt. 128 at 191, 193–96 (Simpson Dep. 191:1–13, 193:6–195:8). Fifth, all three left the parking lot together and went immediately to Simpson's apartment, *see id.*, where they began the process of establishing HSP, *see* Dkt. 128 at 186–89 (Simpson Dep. 186:15–189:19). Sixth, HSP was established the next day and usurped Hedgeye's entire health policy research practice. *See* Dkt. 127 at 144 (Heldman Dep. 144:5–10).

Construing the evidence in the light most favorable to Hedgeye, the Court agrees that a reasonable jury could find that Heldman persuaded his team to carry out a coordinated resignation that left Hedgeye without the most valuable portion of the business that it had intended to acquire from PRG—the health policy research team. *See Benfield, Inc. v. Moline*, No. 04-3513, 2006 WL 452903, at *9 (D. Minn. Feb. 22, 2006) (summary judgment denied because there was a genuine question of material fact regarding whether the defendant solicited his coworkers to leave to a competitor with him where all four employees resigned the same day and immediately began working for the competitor). And a reasonable jury could find that this coordinated—and simultaneous—resignation left Hedgeye without the "opportunity to hire and train replacements." Restatement (Second) of Agency § 393 cmt. e (1958). To be sure, Heldman, Simpson, and Banerjee deny that they had any such plan, and they offer a substantial counternarrative—that Hedgeye management was abusive and unwilling to offer fair compensation to a team that was uniquely profitable to the business. But a reasonable jury might find otherwise. Because Banerjee was a young associate with no other income, for example, a reasonable jury might decline to credit her testimony that she resigned without any assurance of employment from Heldman. Likewise, a reasonable jury might decline to credit Heldman's testimony that he lingered in the parking lot for an hour, not because he was waiting for Simpson and Banerjee to quit and to join him in starting their new business, but because it was a sunny day and he was emotional about leaving a position he had held for seven years.

Because it is not the Court's role to assess the credibility of these and other witnesses or to resolve disputed facts, and because the Court must draw all reasonable inferences in Hedgeye's favor as the non-moving party, the Court must deny Heldman's motion for summary

judgment on Hedgeye's "mass resignation" claim.  *See Coleman v. District of Columbia*, 794 F.3d 49, 63 (D.C. Cir. 2015).

**B.**     **Spoliation**

Before addressing the second motion before the Court—Heldman's motion for Rule 11 sanctions—the Court pauses briefly to address the issue of spoliation raised by Hedgeye in its opposition to Heldman's motion for summary judgment.  *See* Dkt. 125 at 21–23.  In that brief, Hedgeye argues that the Court should impose an adverse inference due to Heldman's alleged failure to preserve three types of evidence: (i) USB flash drives Heldman destroyed prior to leaving Hedgeye, *see* Dkt. 124 at 6 (Pl.'s SUMF ¶ 51), (ii) emails in Heldman's inbox "unrelated to business or unrelated to Hedgeye," *see* Dkt. 127 at 162 (Heldman Dep. 162:10–24), and (iii) text messages once stored in, but now deleted from, Heldman's cell phone, *see* Dkt 125 at 22.

To obtain the adverse inferences it seeks, Hedgeye must make three showings for each category of information.  First, it must show that "the party having control over the evidence had an obligation to preserve it when it was destroyed or altered;" second, Hedgeye must show that "the destruction or loss was accompanied by a 'culpable state of mind;'" and finally, it must demonstrate that "the evidence that was destroyed or altered was 'relevant'" to its claims or defenses, which is measured by "the extent that a reasonable factfinder could conclude that the lost evidence would have supported" Hedgeye's claims.  *Bolger v. District of Columbia*, 608 F. Supp. 2d 10, 30 (D.D.C. 2009) (citation omitted).  As explained below, the Court concludes that Hedgeye has not made this showing for either the USB drives or the emails that Heldman deleted and that the Court need not decide at this juncture whether any spoliation occurred with respect to Heldman's text messages.

As to the USB drives, Hedgeye's argument fails at step one. Heldman destroyed the USB drives "sometime between December 15th, 2015 and January 20th, 2016." Dkt. 127 at 61–62 (Heldman Dep. 61:18–62:7). At that time, no litigation was pending, none had been threatened, and there is no evidence that litigation was anticipated. Thus, Hedgeye has not established that Heldman was under "an obligation to preserve" the USBs.

Next, with respect to the emails, Hedgeye has not offered even the slightest hint of how emails unrelated to Hedgeye or HSP would be relevant to its claims. Indeed, it is difficult to fathom even a speculative theory of how emails having nothing to do with Hedgeye or Heldman's new business relate to the matter at hand. Plaintiffs have therefore failed to show that an adverse inference is warranted based on this category of evidence.

Finally, turning to Heldman's text messages, the Court need not decide at this time whether any spoliation occurred because an adverse evidentiary inference would contribute nothing to the claims that Heldman caused a mass resignation or that the business cards Heldman accumulated constituted trade secrets belonging to Hedgeye, since those claims have already withstood summary judgment. And, as to the client-solicitation claim, Hedgeye has offered no evidence, or even a theory, of how the text messages might be relevant to that claim. It has not shown, for instance, that Heldman ever communicated with clients via text message, nor offered any other basis for the Court to infer that the text messages might have revealed client solicitations undisclosed by all other discovery in the case. The Court, therefore, concludes that an adverse inference is not warranted for the deleted text messages as to the client-solicitation claim.

## C.     Rule 11 Motion

In addition to moving for summary judgment, Heldman has also moved for Rule 11

sanctions against Hedgeye on the grounds that Hedgeye's allegations were "knowingly baseless"

and made in "bad faith." Dkt. 115-1 at 1–2.  In large part, Heldman's motion for sanctions relies

upon and repeats the arguments set out in his motion for summary judgment.  *Compare* Dkt. 90-

1 at 14 (Def. Mot. for Summ. J.) (arguing that there is "[n]o evidence Heldman solicited

Hedgeye's employees during his employment"), *with* Dkt. 115-1 at 9 (Def. Mot. for Sanctions)

(arguing that there is "[n]o evidence of solicitation of clients while Heldman was in Hedgeye's

employ").  Given that the Court has concluded that there are triable issues of fact as to whether

Heldman misappropriated Hedgeye's customer list (in the form of his business cards) and as to

whether he unfairly solicited Banerjee and Simpson to join the competing firm he planned to

create, the sanctions motion clearly fails as to those claims.  Heldman does not resist that

proposition and, indeed, conceded at a status conference that the denial of his summary judgment

motion would "probably take care of [his motion for sanctions]."  *See* Dkt. 120 at 16 (Telephonic

Conference (Jan. 19, 2019)); *see also* Fed. R. Civ. P. 11 advisory committee's note to 1993

amendment ("[I]f a party has evidence with respect to a contention that would suffice to defeat a

motion for summary judgment based thereon, it would have sufficient 'evidentiary support' for

purposes of Rule 11.").

It is less obvious, however, that Heldman's motion for sanctions should fail as to

Hedgeye's claim that Heldman solicited Hedgeye's clients while he was still at Hedgeye.

Although the D.C. Circuit has yet to rule on the issue, other circuits have held that Rule 11

permits sanctions where, as would be the case here, only a part of a pleading is frivolous.  *See,*

*e.g.*, *Wade v. Soo Line R.R. Corp.*, 500 F.3d 559, 562 (7th Cir. 2007) ("A plaintiff who brings

distinct claims, one of which is sanctionable, can be ordered to pay attorneys' fees incurred in defending the frivolous claim–but not those incurred in defending non-sanctionable claims."); *Perez v. Posse Comitatus*, 373 F.3d 321, 325 (2d Cir. 2004) (citation omitted) ("A complaint challenged under Rule 11(b) is not ordinarily analyzed as an indivisible unit. Rather claims are analyzed individually, and the fact that a claim is properly asserted against one defendant does not mean that the same claim may properly be asserted against a different defendant."); *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362–63 (9th Cir. 1991); *Dodd Ins. Servs., Inc.*, 935 F.2d 1152, 1158 (10th Cir. 1990) ("We hold that a pleading containing both frivolous and nonfrivolous claims may violate Rule 11."); *Patterson v. Aiken*, 841 F.2d 386, 387 (11th Cir. 1988) ("Rule 11 does not prevent the imposition of sanctions where it is shown that the Rule was violated as to a portion of a pleading, even though it was not violated as to other portions.").

Even assuming that Rule 11 applies on such a claim-by-claim or allegation-by-allegation basis, however, the Court is unconvinced that Hedgeye's allegations were sufficiently baseless to warrant the "extreme punishment" of sanctions. The test for sanctions under Rule 11 is an objective one that asks whether a reasonable inquiry would have revealed that there was no basis in law or fact for the asserted claim. *See Sharp v. Rosa Mexicano, D.C., LLC*, 496 F. Supp. 2d 93, 100 (D.D.C. 2007). The Court must also "take into consideration that Rule 11 sanctions are a harsh punishment, and what effect, if any, the alleged violations may have had on judicial proceedings," *Robinson-Reeder v. Am. Council on Educ.*, 626 F. Supp. 2d 11, 18 (D.D.C. 2009), and that Rule 11 contemplates that a party may obtain the evidence necessary to support its allegations "after a reasonable opportunity for further investigation or discovery," Fed. R. Civ. P. 11(b)(3). Although the Rule does not permit parties to embark on fishing expeditions regarding

claims that have no "factual basis or justification," it does permit parties to plead matters if they have reason to believe a fact is true but need discovery to "confirm the evidentiary basis for the allegation."  Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment.

Here, although Hedgeye's allegations toed the line separating reasonable pleadings from frivolous ones, they did not cross it.  Hedgeye contends that it had sufficient circumstantial evidence objectively and reasonably to infer that Heldman solicited Hedgeye clients prior to his resignation.  It points to Heldman's alleged uptick in searches for client contact data, pre-departure in-person client meetings, and the fact that a client stopped paying for Hedgeye's services after Heldman left.  *See* Dkt. 118 at 12–13.  The Court concludes that, although a close question, Hedgeye had sufficient reason to believe that its allegations would "likely have evidentiary support after a reasonable opportunity for . . . discovery."  Fed. R. Civ. P. 11(b).  Hedgeye did not have access to information that would have proved, or disproved, the company's belief and, in fact, only learned through the discovery process that Heldman did not solicit any Hedgeye clients while still employed at the firm.  As a result, this was not a case where "the lack of factual support is (or could have been) apparent *prior* to the filing of the deficient submission," *Williams v. Verizon Wash., D.C. Inc.*, 322 F.R.D. 145, 150 (D.D.C. 2017), or where "reasonable inquiry would have revealed there was no basis in . . . fact for the asserted claim," *Ali v. Mid-Atl. Settlement Servs.*, 233 F.R.D. 32, 39 (D.D.C. 2006) (internal citation and quotation omitted); *see also Duncan v. WJLA-TV, Inc.*, 106 F.R.D. 4, 6 (D.D.C. 1984) ("What constitutes 'reasonable inquiry' depends on the circumstances of the case.").

The Court's conclusion is bolstered, moreover, by the absence of any evidence of bad faith or an improper purpose in asserting the client-solicitation claim.  Although Heldman relies on a memorandum prepared by Hedgeye's counsel to support his Rule 11 motion, that

memorandum—which counsel presumably did not expect to become public—acknowledges that counsel lacked "specific factual information," but it also expresses counsel's belief that Heldman "solicit[ed] Hedgeye clients, vendors or employees while employed there" and grounded that belief "on the circumstances, i.e., that he erased his computer history, that he quickly formed Heldman Simpson, and that clients began to leave within days of his quitting Hedgeye." Dkt. 115-2 at 6. It would have been better practice for Hedgeye to plead these claims in the alternative—that is, that Heldman "solicited Hedgeye clients . . . *or* employees"—or to wait to see whether discovery supported the client-solicitation claim before adding it. But, its failure to take either of those more prudent paths does not warrant the imposition of sanctions, particularly where it has been clear since the early days of this litigation that the sustainability of Hedgeye's claims would turn on what discovery revealed. Only now that discovery is complete is it evident that the evidence supports only a portion of Hedgeye's claim for breach of fiduciary duty. *See Dove v. Wash. Metro. Area Transit Auth.*, No. 03-2156, 2005 U.S. Dist. LEXIS 17955, at *12 (D.D.C. Aug. 18, 2005) ("Although the claims contained in the plaintiff's amended complaint were sufficiently ill-founded to merit the granting of summary judgment, a consideration of Rule 11 sanctions involves more than an inquiry into the objective merits of a complaint."); *Carson v. J. Curt, Inc.*, No. 06-098, 2008 WL 4274502, at *3 (N.D. Fla. Sept. 11, 2008) ("Rule 11 sanctions are warranted when a party demonstrates a deliberate indifference to obvious facts, but not when the evidence is merely weak or the case is brought as a result of poor judgment." (internal citations and quotations omitted)). The Court thus concludes that the imposition of Rule 11 sanctions is not warranted in this case.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** in part and **DENIES** in part Defendant's

motion for summary judgment, Dkt. 90, and **DENIES** Defendant's motion for sanctions, Dkt.

115.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  September 29, 2019